IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONAN DOYLE ESTATE LIMITED,<br><br>                   Plaintiff,<br>v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",<br><br>                   Defendants. | Case No. 23-cv-14556<br><br>**Judge Martha M. Pacold**<br><br>**Magistrate Judge Jeffrey Cole** |

## DECLARATION OF PAUL VARLEY

I, Paul Varley, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am currently retained by Conan Doyle Estate Limited ("Plaintiff") as a consultant. I am knowledgeable about, or have access to, business records concerning all aspects of the Plaintiff's brand protection operation including, but not limited to, its trademarks, sales, licensees, online sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Plaintiff Conan Doyle Estate Limited is a United Kingdom corporation formed by the family of Sir Arthur Conan Doyle. Plaintiff manages the literary, merchandising, and advertising rights in Sir Arthur Doyle's works and all characters, including Sherlock Holmes.

1

4. Sir Arthur Conan Doyle created Sherlock Holmes in his 1887 novella *A Study in Scarlet*. Sherlock Holmes is one of the most successfully licensed characters who is known and loved all over the world. Widely considered a British cultural icon, Sherlock Holmes is arguably the best-known fictional detective with Guinness World Records listing him as the "most portrayed movie character" in history. Sherlock Holes is known for his proficiency with observation, forensic science, and logical reasoning that borders on the fantastic, which he employs when investigating cases for a wide variety of clients.

5. Plaintiff has authorized major film and television adaptations of Conan Doyle's work and has worked with authors and other creative individuals to release new Sherlock Holmes stories in various media in order to make Conan Doyle's works available to viewers worldwide. To date, Conan Doyle's characters have been translated onto the page, into products, and onto the big screen by Hollywood and beyond. Indeed, numerous movie stars have portrayed Conan Doyle's Sherlock Holmes character, including Jeremy Brett in "The Adventures of Sherlock Holmes", Robert Downy Jr. in "Sherlock Holmes", and Benedict Cumberbatch in the BBC original TV series "Sherlock".

6. Plaintiff and its licensees market and sell a variety of licensed products emanating from the various adaptations of Sherlock Holmes, including clothing and other merchandise bearing the SHERLOCK HOLMES trademarks (collectively, "Plaintiff's Products"). Plaintiff's Products have become enormously popular and even iconic, driven by Plaintiff's quality standards. Among the purchasing public, Plaintiff's Products are instantly recognizable as such. Plaintiff's Products are distributed and sold to consumers only through authorized licensees, including through websites such as sherlockholmestartan.com.

7. Plaintiff and its licensees have used the SHERLOCK HOLMES trademarks, and other trademarks, and have continuously sold products under Plaintiff's trademarks (collectively, "Plaintiff's Trademarks"). As a result of this long-standing use, strong common law trademark rights have amassed in Plaintiff's Trademarks. Plaintiff and its licensees' use of the marks has also built substantial goodwill in Plaintiff's Trademarks. Plaintiff's Trademarks are famous marks and valuable assets of Plaintiff. Plaintiff's Products typically include at least one of Plaintiff's Trademarks.

8. Plaintiff's Trademarks are registered with the United States Patent and Trademark Office. True and correct copies of the federal trademark registration certificates for Plaintiff's Trademarks are attached hereto as **Exhibit 1**. Plaintiff's Trademarks are valid, subsisting, and in full force and effect.

9. Plaintiff's Trademarks are exclusive to Plaintiff and are displayed extensively on Plaintiff's Products and in marketing and promotional materials. Plaintiff's Trademarks are also distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff, or its licensees, and are manufactured to Plaintiff's quality standards. Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that products bearing Plaintiff's Trademarks are manufactured to the highest quality standards.

10. Plaintiff's Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned. The success of the Sherlock Holmes line of television shows, movies, and books, in addition to the marketing of Plaintiff's Products, have enabled the Sherlock Holmes brand to achieve widespread recognition and fame and have made Plaintiff's Trademarks some of the most well-known

marks in the entertainment industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Sherlock Holmes brand have made Plaintiff's Trademarks valuable assets of Plaintiff.

11. Products bearing Plaintiff's Trademarks have been the subject of substantial and continuous marketing and promotion. Plaintiff has marketed and promoted, and continues to market and promote, Plaintiff's Trademarks to consumers through various licensees, including through officially licensed websites such as sherlockholmestartan.com.

12. Plaintiff has expended substantial time, money, and other resources advertising, promoting, and marketing Plaintiff's Products. Plaintiff's Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the Sherlock Holmes brand. As a result, products bearing Plaintiff's Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Plaintiff or its licensees. Plaintiff's Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with Plaintiff's Trademarks is of immeasurable value to Plaintiff.

13. Plaintiff's Products are sold only by Plaintiff or through authorized licensees and are recognized by the public as being exclusively associated with the Sherlock Holmes brand.

14. The success of the Sherlock Holmes brand has resulted in significant counterfeiting of Plaintiff's Trademarks. Because of this, Plaintiff has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Plaintiff has identified many fully interactive e-commerce stores offering products using infringing and counterfeit versions of Plaintiff's federally registered trademarks ("Unauthorized Products") on online

marketplace platforms like Alibaba Group Holding Ltd. ("Alibaba"), AliExpress.com ("AliExpress"), Amazon.com, Inc. ("Amazon"), eBay, Inc. ("eBay"), Etsy, Inc. ("Etsy"), Fruugo.com Limited ("Fruugo"), Pixels.com, LLC d/b/a Pixels.com ("Pixels"), Printerval.com ("Printerval"), Qoo10 Pte. Ltd. ("Qoo10"), Redbubble Limited ("Redbubble"), Spreadshirt, Inc. ("Spreadshirt"), TP Apparel LLC ("TeePublic"), and Context Logic, Inc. d/b/a Wish.com ("Wish"), including the e-commerce stores operating under the seller aliases identified in Schedule A to the operative complaint (the "Seller Aliases"). The Seller Aliases target consumers in this Judicial District and throughout the United States.

15. I perform, supervise, and/or direct investigations related to Internet-based infringement of Plaintiff's Trademarks. Our investigation shows that Defendants are using the Seller Aliases to sell Unauthorized Products, from foreign jurisdictions to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the e-commerce stores operating under the Seller Aliases and determined that Unauthorized Products were being offered for sale to residents of the United States, including Illinois residents. This conclusion was reached through visual inspection of the products listed for sale on each e-commerce store, the price at which the Unauthorized Products were offered for sale, other features commonly associated with e-commerce stores selling counterfeit products, and because Defendants and their e-commerce stores do not conduct business with Plaintiff and do not have the right or authority to use Plaintiff's Trademarks. Additionally, each e-commerce store offered shipping to the United States, including Illinois. True and correct copies of screenshot printouts showing the active e-commerce stores operating under the Seller Aliases reviewed are attached as **Exhibit 2**.

16. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold Unauthorized Products to residents of Illinois.

17. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use any of its Trademarks and none of the Defendants are authorized retailers of Plaintiff's Products.

18. Many Defendants also deceive unknowing consumers by using Plaintiff's Trademarks within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Plaintiff's Products. Other e-commerce stores operating under Seller Aliases omit using Plaintiff's Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's Products.

19. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete

information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

20. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

21. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

22. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators, like Defendants, of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff,

and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

23. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Plaintiff's enforcement efforts. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff.

24. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff, have jointly and severally, knowingly and willfully used and continue to use Plaintiff's Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

25. Monetary damages alone cannot adequately compensate Plaintiff for ongoing infringement because monetary damages fail to address the loss of control of and damage to Plaintiff's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to Plaintiff's reputation and goodwill by acts of infringement.

26. Plaintiff's goodwill and reputation are irreparably damaged when its Trademarks are used in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Plaintiff. Moreover, consumer brand confidence is damaged, which can

result in a loss of future sales and market share. The extent of harm to Plaintiff's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

27. Plaintiff is further irreparably harmed by the unauthorized use of Plaintiff's Trademarks because counterfeiters take away Plaintiff's ability to control the nature and quality of the Unauthorized Products. Loss of quality control over goods offered for sale or sold under Plaintiff's Trademarks and, in turn, loss of control over Plaintiff's reputation is neither calculable nor precisely compensable.

28. The use of Plaintiff's Trademarks in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Plaintiff is likely causing and will continue to cause consumer confusion, which weakens Plaintiff's brand recognition and reputation. Consumers who mistakenly believe that the Unauthorized Products originate from Plaintiff will come to believe that Plaintiff offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with Plaintiff's Products, resulting in a loss or undermining of Plaintiff's reputation and goodwill. Indeed, there is damage to Plaintiff's reputation and goodwill even if a consumer knows the goods they are purchasing are counterfeit. Prospective consumers who see Unauthorized Products used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Plaintiff and its Trademarks. Such post-sale confusion results in damage to Plaintiff's reputation and correlates to a loss of unquantifiable future sales.

29. Plaintiff is further irreparably damaged due to a loss of exclusivity. Plaintiff's Products are meant to be exclusive. Plaintiff's extensive marketing efforts and distribution of

Plaintiff's Products are aimed at growing and sustaining sales of Plaintiff's Products. Plaintiff's Trademarks are distinctive and signify to consumers that the products originate from Plaintiff and are manufactured to Plaintiff's high-quality standards. When counterfeiters use Plaintiff's Trademarks to offer for sale or sell goods without Plaintiff's authorization, the exclusivity of Plaintiff's products, as well as Plaintiff's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

30. Plaintiff will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October __4th__, 2023, at London, United Kingdom.

/s/ _____
Paul Varley